1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   BARRY ALAN LAYTON,                        No.  2:14-cv-01153-WBS-GGH

12              Petitioner,

13        v.                                   FINDINGS AND RECOMMENDATIONS

14   STEVEN K. BORDIN,

15              Respondent.

16

17   INTRODUCTION AND SUMMARY

18        Petitioner, a former county prisoner currently serving a three-year term of probation, is

19   proceeding through retained counsel with a petition for a writ of habeas corpus pursuant to 28

20   U.S.C. § 2254.  Petitioner was convicted of resisting a peace officer and carrying a concealed

21   weapon.  He was sentenced to a three-year term of probation with various conditions, including

22   45 days in county jail.  Petitioner challenges his conviction on the following grounds: 1) his

23   conviction for carrying a concealed firearm was unconstitutional in violation of the Second

24   Amendment; and 2) his conviction for obstructing, delaying, or resisting a peace officer was

25   supported by insufficient evidence in violation of the Due Process Clause.

26        Upon careful consideration of the record and the applicable law, the undersigned will

27   recommend that petitioner's application for habeas corpus relief be denied.

28   / / /

                                              1

1    BACKGROUND

2          On the evening of December 9, 2011, petitioner's elderly mother, Lynn Layton, had fallen

3    near the parking lot of Pelican's Roost restaurant, located in the Town of Paradise.  RT 187.  Mr.

4    and Mrs. Crotwell were leaving the restaurant when they observed Ms. Layton on the ground and

5    saw petitioner trying to help her up.  RT 62.  They tried to assist Ms. Layton as she lay in the

6    parking lot, but petitioner rejected the Crotwells, stating that his mother "needs to do it."  RT 61–

7    64.  Petitioner began to pull on one of Ms. Layton's arms to help her up.  RT 64–65, 76.  When

8    Mr. Crotwell approached to assist, petitioner reacted angrily and put his finger in Mr. Crotwell's

9    face.  RT 66, 76.  Mrs. Crotwell ran back into the restaurant for help.  RT 77.  After Mrs.

10   Crotwell went back inside the restaurant, a busboy employed by the restaurant went outside to

11   help Ms. Layton.  RT 89.  However, Petitioner stopped the busboy, yelling and cursing at him.

12   RT 91–92.  Mr. Crotwell retreated and called 911.  RT 77, 81–82.

13         Paradise Police Officer Wright and supervising Watch Commander Sergeant Gallagher

14   arrived in response to calls for service which initially requested medical aid but changed to a

15   person that was being combative and assaulting the public.  RT at 95, 114, 137–38.  Mr. Crotwell

16   directed them to petitioner and his parents.  RT at 115–16.  Officer Wright was also informed that

17   petitioner was the person demonstrating assaultive behavior.  RT 96.  Officer Wright approached

18   petitioner to investigate both the medical issue and the reported assault.  RT at 98–99.  Petitioner

19   denied a crime had occurred.  RT at 99, 117.  According to Officer Wright, Ms. Layton appeared

20   to require help moving, and Officer Wright moved to help her.  RT at 100.  Intervening, petitioner

21   grabbed Officer Wright's arm and threw it to the side.  RT at 101, 118.  After seeing petitioner go

22   "hands-on" with Officer Wright, Sergeant Gallagher approached and ordered petitioner to move

23   to a location away from his parents.  RT at 118.  Petitioner refused to comply.  RT at 119.

24   Subsequently, petitioner was placed in handcuffs.  RT at 119–21.  Petitioner was searched and a

25   loaded firearm was recovered from the pocket of the jacket he wore.  RT at 124-26.  He lacked a

26   permit for the firearm.  RT at 126–27.  A folding knife was later recovered from his person.  RT

27   at 131.

28   / / /

1    DISCUSSION

2    I.      AEDPA Standards

3           The statutory limitations of federal courts' power to issue habeas corpus relief for persons

4    in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

5    Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

6                   An application for a writ of habeas corpus on behalf of a person in
                    custody pursuant to the judgment of a State court shall not be
7                   granted with respect to any claim that was adjudicated on the merits
                    in State court proceedings unless the adjudication of the claim-
8
                    (1) resulted in a decision that was contrary to, or involved an
9                   unreasonable application of, clearly established Federal law, as
                    determined by the Supreme Court of the United States; or
10
                    (2) resulted in a decision that was based on an unreasonable
11                  determination of the facts in light of the evidence presented in the
                    State court proceeding.
12

13          As a preliminary matter, the Supreme Court has recently held and reconfirmed "that §

14   2254(d) does not require a state court to give reasons before its decision can be deemed to have

15   been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S.Ct. 770, 785 (2011).

16   Rather, "when a federal claim has been presented to a state court and the state court has denied

17   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

18   of any indication or state-law procedural principles to the contrary."  Id. at 784–785, citing Harris

19   v. Reed, 489 U.S. 255, 265, 109 S.Ct. 1038 (1989) (presumption of a merits determination when

20   it is unclear whether a decision appearing to rest on federal grounds was decided on another

21   basis).  "The presumption may be overcome when there is reason to think some other explanation

22   for the state court's decision is more likely."  Id. at 785.

23          The Supreme Court has set forth the operative standard for federal habeas review of state

24   court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an unreasonable

25   application of federal law is different from an incorrect application of federal law.'"  Harrington,

26   131 S.Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S.Ct. 1495 (2000).  "A state

27   court's determination that a claim lacks merit precludes federal habeas relief so long as

28   'fairminded jurists could disagree' on the correctness of the state court's decision."  Id. at 786,

3

1   citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004).

2          Accordingly, "a habeas court must determine what arguments or theories supported or . . .

3   could have supported[] the state court's decision; and then it must ask whether it is possible

4   fairminded jurists could disagree that those arguments or theories are inconsistent with the

5   holding in a prior decision of this Court." Id. "Evaluating whether a rule application was

6   unreasonable requires considering the rule's specificity.  The more general the rule, the more

7   leeway courts have in reaching outcomes in case-by-case determinations.'"  Id.  Emphasizing the

8   stringency of this standard, which "stops short of imposing a complete bar of federal court

9   relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has

10  cautioned that "even a strong case for relief does not mean the state court's contrary conclusion

11  was unreasonable."  Id., citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003).

12         The undersigned also finds that the same deference is paid to the factual determinations of

13  state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

14  subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

15  decision that was based on an unreasonable determination of the facts in light of the evidence

16  presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

17  2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

18  factual error must be so apparent that "fairminded jurists" examining the same record could not

19  abide by the state court factual determination.  A petitioner must show clearly and convincingly

20  that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct.

21  969, 974 (2006).

22         The habeas corpus petitioner bears the burden of demonstrating the objectively

23  unreasonable nature of the state court decision in light of controlling Supreme Court authority.

24  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must

25  show that the state court's ruling on the claim being presented in federal court was so lacking in

26  justification that there was an error well understood and comprehended in existing law beyond

27  any possibility for fairminded disagreement."  Harrington, 131 S.Ct. at 786–787.  "Clearly

28  established" law is law that has been "squarely addressed" by the United States Supreme Court.

4

1  Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008).  Thus, extrapolations of

2  settled law to unique situations will not qualify as clearly established.  See e.g., Carey v.

3  Musladin, 549 U.S. 70, 76, 127 S.Ct. 649, 653-54 (2006) (established law not permitting state

4  sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear

5  prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly

6  established law when spectators' conduct is the alleged cause of bias injection).  The established

7  Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other

8  controlling federal law, as opposed to a pronouncement of statutes or rules binding only on

9  federal courts.  Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

10      When a state court decision on a petitioner's claims rejects some claims but does not

11  expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

12  the federal claim was adjudicated on the merits.  Johnson v. Williams, ___ U.S. ___, 133 S.Ct.

13  1088, 1091 (2013).

14      The state courts need not have cited to federal authority, or even have indicated awareness

15  of federal authority in arriving at their decision.  Early, 537 U.S. at 8, 123 S.Ct. at 365.  Where

16  the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the

17  federal court will independently review the record in adjudication of that issue.  "Independent

18  review of the record is not de novo review of the constitutional issue, but rather, the only method

19  by which we can determine whether a silent state court decision is objectively unreasonable."

20  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

21      Finally, if the state courts have not adjudicated the merits of the federal issue, no

22  AEDPA deference is given; the issue is reviewed de novo under general principles of federal law.

23  Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012).

24  II.    Second Amendment Claim

25      Petitioner contends his conviction for carrying a concealed firearm violated his Second

26  Amendment rights because the California statutes on carrying concealed firearms and the related

27  requirement of county-issued concealed weapons permits are invalid under District of Columbia

28  v. Heller, 554 U.S. 570 (2008), McDonald v. City of Chicago, 561 U.S. 742 (2010) and Peruta v.

1    County of San Diego, 742 F.3d 1144 (9th Cir. 2014).  Respondent contends there is no clearly

2    established law that squarely addresses the issue of firearm possession outside of the home.

3          In Heller, a D.C. special police officer challenged D.C.'s gun control laws.  The laws

4    made it a crime to carry unregistered firearms but prohibited registration of handguns.  Id. at 574.

5    The laws gave the chief of police discretion to issue licenses to carry handguns.  Id. at 575.  In

6    addition, the laws required "residents to keep their lawfully-owned arms, such as registered long

7    guns, 'unloaded and disassembled or bound by a trigger lock or similar device' unless they are

8    located in a place of business or are being used for lawful recreational activities."  Id.  The D.C.

9    police officer, authorized to carry a handgun while on duty, applied for a certificate to keep a

10   handgun at home.  Id. at 576.  The District refused.  Id.  The police officer then filed a civil action

11   arguing that the D.C. gun control laws violate the Second Amendment and thus should be

12   permanently enjoined.  See Parker v. District of Columbia, 311 F.Supp.2d 103, 109 (2004).  The

13   District Court dismissed the complaint and the Court of Appeals for the District of Columbia

14   Circuit reversed.  Heller, 554 U.S. at 576.  The Supreme Court held that the District of

15   Columbia's gun control laws violated the Second Amendment.  Id. at 635 ("In sum, we hold that

16   the District's ban on handgun possession in the home violates the Second Amendment, as does its

17   prohibition against rendering any lawful firearm in the home operable for the purpose of

18   immediate self-defense.").

19         Subsequently, the Supreme Court concluded "that the Second Amendment right is fully

20   applicable to the States."  McDonald, 561 U.S. at 750.  In McDonald, several Chicago residents

21   desired to keep handguns in their homes for self-defense but were prohibited by Chicago's

22   firearms laws.  Id.  Chicago's firearm laws were such that they effectively banned "handgun

23   possession by almost all private citizens who reside in the City."  Id.  The residents filed suit

24   against the city seeking a declaration that the handgun laws violated the Second and Fourteenth

25   Amendments to the United States Constitution.  Id. at 752.  The Supreme Court held that "the

26   Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right

27   recognized in Heller," and the Chicago gun laws violated that right.  Id. at 791.

28   / / /

1    Recently, the Ninth Circuit has held that a county's "'good cause' permitting requirement

2    impermissibly infringes on the Second Amendment right to bear arms in lawful self-defense."

3    Peruta, 742 F.3d at 1179.  In Peruta, residents of San Diego County sought concealed-carry

4    licenses and were denied because "they could not establish 'good cause' or decided not to apply,

5    confident that their mere desire to carry for self-defense would fall short of establishing 'good

6    cause' as the County defines it."  Id. at 1148.  The Ninth Circuit explained:

7
> It doesn't take a lawyer to see that straightforward application of
> the rule in *Heller* will not dispose of this case.  It should be equally
8    > obvious that neither *Heller* nor *McDonald* speaks explicitly or
> precisely to the scope of the Second Amendment right outside the
9    > home or to what it takes to "infringe" it.  Yet, it is just as apparent
> that neither opinion is silent on these matters, for, at the very least,
10   > "the Supreme Court's approach . . . points in a general direction."
> To resolve the challenge to the D.C. restrictions, the *Heller* majority
11   > described and applied a certain methodology: it addressed, first,
> whether having operable handguns in the home amounted to
12   > "keep[ing] and bear[ing] Arms" within the meaning of the Second
> Amendment and, next, whether the challenged laws, if they indeed
13   > did burden constitutionally protected conduct, "infringed" the right.

14   Id. at 1150 (internal citation omitted).  The Ninth Circuit performed that analysis and concluded

15   that the right to carry an operable handgun outside the home for self-defense constitutes

16   "bear[ing] Arms" within the meaning of the Second Amendment and that the "good cause"

17   permitting requirement infringed on that right.  Id. at 1166, 1179.

18   As respondent asserts, neither Heller nor McDonald is controlling in this case and thus

19   neither can stand as "clearly established law" under AEDPA.  In White v. Woodall, the Supreme

20   Court stated that "state courts must reasonably apply the rules 'squarely established' by this

21   Court's holdings to the facts of each case."  134 S.Ct. 1697, 1706 (quoting Knowles v.

22   Mirzayance, 556 111, 122, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009).  As explained above, Heller

23   and McDonald establish that there is a Second Amendment right to keep a handgun as well as an

24   operable firearm in the home.  Such a rule does not "establish" a rule for the situation at hand

25   where petitioner was arrested outside of the home and found to be carrying a handgun without a

26   concealed weapons permit.

27   / / /

28   / / /

7

1      Peruta is not controlling because it did not strike down the California law requiring a

2 license to carry a concealed weapon.  742 F.3d at 1172 ("To be clear, we are not holding that the

3 Second Amendment requires the states to permit concealed carry.").  But the larger point here is

4 that even if Peruta could be held to favor petitioner's position, AEDPA commands that the federal

5 "established" authority be that of the United States Supreme Court.  That Court has cautioned on

6 numerous occasions that circuit authority will not establish a federal rule for AEDPA purposes.

7 See Parker v. Matthews, __U.S.__, 132 S.Ct. 2148, 2155-56 (2012)

8      Insufficient Evidence

9      Petitioner contends that his due process rights had been violated because his conviction

10 for obstructing, delaying or resisting a peace officer was not supported by sufficient evidence.

11 When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is

12 available if it is found that upon the record evidence adduced at trial, viewed in the light most

13 favorable to the prosecution, no rational trier of fact could have found "the essential elements of

14 the crime" proven beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct.

15 2781, 61 L.Ed.2d 560 (1979).  Jackson established a two-step inquiry for considering a challenge

16 to a conviction based on sufficiency of the evidence.  United States v. Nevils, 598 F.3d 1158,

17 1164 (9th Cir.2010) (en banc).

18
19     First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution.  Jackson, 443 U.S. at 319, 99 S.Ct. 2781. . . [W]hen "faced with a record of historical facts that supports conflicting inferences" a reviewing court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Id. at 326, 99 S.Ct. 2781; see also McDaniel, 130 S.Ct. at 673–74.

20
21
22

23     Second, after viewing the evidence in the light most favorable to the prosecution, the reviewing court must determine whether this evidence, so viewed, is adequate to allow "any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt."  Jackson, 443 U.S. at 319, 99 S.Ct. 2781.

24
25

26     [¶] . . .[¶]

27     At this second step, we must reverse the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to

28

1    establish every element of the crime beyond a reasonable doubt."
     See id.

2

3    Id.

4        Superimposed on these already stringent insufficiency standards is the AEDPA

5    requirement that even if a federal court were to initially find on its own that no reasonable jury

6    should have arrived at its conclusion, the federal court must also determine that the state appellate

7    court could not have affirmed the verdict under the Jackson standard in the absence of an

8    unreasonable determination.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).

9        A federal habeas court determines sufficiency of the evidence in reference to the

10   substantive elements of the criminal offense as defined by state law.  See Jackson, 443 U.S. at

11   324 n. 16.  To establish a violation of California Penal Code section 148(a)(1), the prosecution

12   must prove: "'(1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when

13   the officer was engaged in the performance of his or her duties, and (3) the defendant knew or

14   reasonably should have known that the other person was a peace officer engaged in the

15   performance of his or her duties.'"  Smith v. City of Hemet, 394 F.3d 689, 695 (9th Cir. 2005)

16   (quoting In re Muhammed C., 95 Cal. App. 4th 1325, 1329 (2002)).

17       Based on the testimony of Officer Wright and Sergeant Gallagher, a fairminded jurist

18   could have found the essential elements of Penal Code Section 148 beyond a reasonable doubt—

19   that petitioner resisted, delayed, or obstructed Officer Wright and Sergeant Gallagher in their

20   investigation of an assault at the Pelican's Roost.  Certainly, the California courts were not

21   unreasonable in so finding.  On December 9, 2011 at approximately 6:30 p.m., they responded to

22   a call for service at Pelican's Roost.  RT 95, 113.  The cause for service was initially a medical

23   aid of an elderly person but had changed to a person that was being combative and assaulting the

24   public.  RT 95, 114.  Arriving at the scene in a marked car and in uniform, Officer Wright

25   observed petitioner and his parents walking to the parking lot.  RT 96–97.  He was informed by

26   that petitioner was the person demonstrating assaultive behavior.  RT 96.  Officer Wright

27   approached petitioner to speak with him.  RT 98.  Petitioner responded that he did not need

28   Officer Wright's help.  RT 99.  Officer Wright further indicated that he was trying to investigate a

9

1  crime to which petitioner responded "there is no crime here."  RT 99, 117.  Officer Wright

2  described petitioner as short and belligerent.  RT 99.  Officer Wright then asked Ms. Layton if she

3  needed medical attention to which she stated that she did not.  RT 99–100.  He stated that he

4  needed to speak with petitioner and asked Ms. Layton to go to the car.  RT 99.  Based on his

5  observations, Officer Wright believed Ms. Layton needed help so he tried to escort her to the car.

6  RT 100.  As Officer Wright motioned to help petitioner's mother, petitioner grabbed Officer

7  Wright's arm and pulled him away.  RT 100–01, 118.  After seeing petitioner go "hands-on" with

8  Officer Wright, Sergeant Gallagher approached and ordered petitioner to move to a location away

9  from his parents.  RT 118.  Petitioner refused to comply.  RT 119.  He was then placed in

10  handcuffs.  RT 119–21.

11      Petitioner contends the officers exceeded the scope of their duties when they arrived at the

12  Pelican's Roost.  Petitioner characterizes Officer Wright and Sergeant Gallagher as officious

13  intermeddlers, responding to a false report that an assault had occurred.  Nonetheless, petitioner

14  concedes that they were entitled to investigate that report and that petitioner was "remonstrating

15  with Officer Wright."  ECF No. 1 at 31.  None of these assertions negates the following facts: 1)

16  the officers responded to a call for service to investigate an assault, 2) petitioner was identified as

17  the person who exhibited assaultive behavior, and 3) petitioner grabbed the arm of Officer

18  Wright.  Petitioner also argues, without supporting authority, that he engaged in protected speech

19  during the confrontation, by asserting his purported right to escort his mother to the car.  Even if

20  the act of escorting his mother in a parking lot were protected activity, petitioner's act of grabbing

21  Officer Wright's arm surely is not.  Petitioner's contentions that the officers exceeded the scope

22  of their duties and that his arrest was violation of his First Amendment rights are without merit.

23  Petitioner's sufficiency of evidence claim should be denied.

24  CONCLUSION

25      For all the foregoing reasons, the petition should be denied.  Pursuant to Rule 11 of the

26  Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of

27  appealability when it enters a final order adverse to the applicant.  A certificate of appealability

28  may issue only "if the applicant has made a substantial showing of the denial of a constitution

1  right." 28 U.S.C. § 2253(c)(2).  For the reasons set forth in these findings and recommendations,

2  a substantial showing of the denial of a constitutional right has not been made in this case.

3       Accordingly, IT IS HEREBY RECOMMENDED that:

4       1.  Petitioner's application for a writ of habeas corpus be denied; and

5       2.  The District Court decline to issue a certificate of appealability.

6       These findings and recommendations are submitted to the United States District Judge

7  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen days

8  after being served with these findings and recommendations, any party may file written

9  objections with the court and serve a copy on all parties.  Such a documents should be captioned

10  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

11  shall be served and filed within fourteen days after service of the objections.  Failure to file

12  objections within the specified time may waive the right to appeal the District Court's order.

13  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

15  Dated: February 1, 2015

16             <u>/s/ Gregory G. Hollows</u>

17             UNITED STATES MAGISTRATE JUDGE

20  GGH:016/Layt1153